**********************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

**********************************************

# STATE OF CONNECTICUT *v.* JOHN MALLOZZI
## (SC 21052)

Mullins, C. J., and D'Auria, Ecker, Alexander,
Dannehy and Bright, Js.

### *Syllabus*

The defendant, who was chairman of the Stamford Democratic City Committee during the 2015 municipal election cycle, appealed, on the granting of certification, from the judgment of the Appellate Court, which had affirmed his conviction of fourteen counts each of the crimes of false statement in absentee balloting and forgery in the second degree. The defendant's conviction stemmed from his involvement in the submission of fraudulent absentee ballot applications and absentee ballots to the Stamford town clerk in 2015. Prior to the defendant's arrest, K, a state forensic science examiner, analyzed the handwriting on certain absentee ballot applications and compared them with handwriting exemplars supplied by the defendant. K also prepared certain case notes and two reports in connection with his analysis. Subsequently, an inspector with the Division of Criminal Justice prepared the affidavit in support of the warrant for the defendant's arrest, which stated that, according to K, there were indications of "common authorship" between the defendant's exemplars and fourteen applications that had been submitted on behalf of individuals who had neither completed absentee ballot applications nor voted by absentee ballot in 2015. The affidavit quoted K's conclusion that "the totality of the case point[ed] strongly toward" the defendant being the author of the relevant documents. Prior to trial, the prosecution disclosed to the defense its intent to call K as an expert witness, but the defense did not disclose to the prosecution any intent to call its own expert witness. At trial, K, who was the state's final witness, testified that, although there were indications of "common authorship" between the relevant documents and the exemplars, that was "far short of an identification." Nonetheless, K testified that, on the basis of his examination of all of the relevant documents and exemplars, "[t]he totality of [his] opinion" was that it was "virtually certain" and "[h]ighly probable" that the relevant documents and the defendant's exemplars "shared a common author." During or at the conclusion of his cross-examination of K, defense counsel requested a continuance and urged the court to allow him to call his own expert witness to respond to K's conclusion that it was "virtually certain" that the relevant documents and the defendant's exemplars shared a common author, primarily because K's conclusion had not been included in his case notes and reports, which had been disclosed to the defense prior to trial. The trial court ultimately denied defense counsel's request to call his own expert witness. The Appellate Court affirmed the judgment of conviction, and the defendant, on appeal to this court, claimed that the Appellate Court incorrectly concluded that the trial court had not abused its discretion in denying defense counsel's request to call an expert to rebut K's testimony. *Held*:

The Appellate Court correctly concluded that the trial court had not abused its discretion in denying defense counsel's request to present the testimony of a previously undisclosed expert witness.

Although the rules of practice (§ 40-13 (c)) embrace a presumption against precluding a witness' testimony as a sanction for a delayed disclosure, it is incumbent on the party seeking to introduce the testimony of the previously undisclosed witness to make a showing of good cause for the late disclosure, and, in the present case, the trial court reasonably could have concluded that the defense had failed to demonstrate good cause for its late disclosure.

Defense counsel's request to present testimony from a previously undisclosed and unidentified expert witness on the fifth day of trial, made during or at the conclusion of his cross-examination of the state's final witness, constituted a substantial departure from the defense's disclosure obligations.

Moreover, although defense counsel claimed that he was surprised by K's testimony that it was "virtually certain" and "[h]ighly probable" that the defendant had authored the relevant documents given that K's case notes and reports did not indicate such a conclusion, the arrest warrant affidavit quoted K's conclusion that "the totality of the case point[ed] strongly toward" the defendant being the author of the relevant documents, and any discrepancy between K's case notes and reports, on the one hand, and the quoted conclusion of K in the arrest warrant affidavit, on the other, was readily apparent to the defense before trial.

Furthermore, defense counsel, in seeking to call an expert to rebut K's testimony, did not identify the undisclosed expert by name or title, or provide any meaningful information regarding the substance of the expert's expected testimony, and, in light of these vague representations, it would be speculative for this court to consider the prejudice to the parties in connection with the late disclosure or the desirability of allowing the proposed expert to testify.

Argued March 4—officially released July 14, 2026

*Procedural History*

Substitute information charging the defendant with fourteen counts each of the crimes of false statement in absentee balloting and forgery in the second degree, brought to the Superior Court in the judicial district of Stamford-Norwalk, geographical area number one, and tried to the court, *Randolph, J.*; finding and judgment of guilty, from which the defendant appealed to the Appellate Court, *Elgo, Cradle* and *Prescott, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Stephan E. Seeger*, with whom, on the brief, was *Igor Kuperman*, for the appellant (defendant).

*Nathan J. Buchok*, assistant state's attorney, with whom were *Laurence G. Tamaccio*, assistant state's attorney, and, on the brief, *Paul J. Ferencek*, state's attorney, and *Michael C. Bivona*, assistant state's attorney, for the appellee (state).

*Opinion*

BRIGHT, J. The defendant, John Mallozzi, was convicted, after a court trial, of fourteen counts of false statement in absentee balloting in violation of General Statutes § 9-359a and fourteen counts of forgery in the second degree in violation of General Statutes § 53a-139 (a) (3). The Appellate Court affirmed the judgment of conviction on appeal; see *State* v. *Mallozzi*, 225 Conn. App. 787, 790, 821, 317 A.3d 131 (2024); and we granted the defendant's petition for certification to appeal. See *State* v. *Mallozzi*, 350 Conn. 911, 324 A.3d 142 (2024). The sole issue in this certified appeal is whether the trial court abused its discretion when it denied defense counsel's request, during trial, to disclose an expert to rebut the testimony of the state's handwriting expert.[1] Because we conclude that the trial court did not abuse its discretion, we affirm the judgment of the Appellate Court.

The record reveals the following relevant facts, either found by the trial court or undisputed, and procedural history. In 2015, the city of Stamford held municipal elections for various offices. At that time, Donna Loglisci was the Stamford town clerk, whose duties included administering absentee voting for the election.

---

[1] We granted the petition for certification, limited to the following issue: "Did the Appellate Court correctly conclude that the trial court had not abused its discretion in denying defense counsel's request to *obtain* and disclose an expert to rebut the testimony of the state's handwriting expert?" (Emphasis added.) *State* v. *Mallozzi*, supra, 350 Conn. 911. Because the record establishes that the defense had obtained an expert, we have reformulated the certified question to reflect more accurately the issue presented on appeal. See, e.g., *DiPietro* v. *Farmington Sports Arena, LLC*, 306 Conn. 107, 111 n.2, 49 A.3d 951 (2012).

Under the statutory scheme for absentee voting, an eligible voter must submit a completed application for an absentee ballot to the voter's town clerk; see General Statutes § 9-140 (a); and the town clerk must issue the applicant an absentee voting set, which includes an absentee ballot, an inner envelope for the ballot, an outer envelope for its return, and instructions for its use. See General Statutes § 9-140 (e). The voting set must be given to the applicant when requested in person; otherwise, it shall be sent by mail to the applicant at the address listed on the application. General Statutes § 9-140 (g) (1). A voter inserts the completed ballot into the inner envelope, signs the inner envelope, inserts the inner envelope into the outer envelope, and returns the outer envelope to the town clerk before polls close on the day of the election. See General Statutes § 9-140a.

During the 2015 election cycle, the defendant—then the chairman of the Stamford Democratic City Committee—asked Loglisci whether she would give him voting sets for Stamford residents who were unable to vote in person if he submitted their absentee ballot applications. Although Loglisci knew that giving voting sets to someone other than the applicant is unlawful, she nevertheless agreed to distribute voting sets to the defendant and his associates. Loglisci's staff provided voting sets to the defendant and his associates in the weeks leading up to the election, and a staff member wrote the defendant's initials on the upper right-hand corner of each application submitted by the defendant or his associates.[2]

After the election, the State Elections Enforcement Commission (SEEC) received a complaint that Shkadran Hoti had voted twice in the municipal election. When Shkadran Hoti arrived at his polling place on the day of the election, he was told that he had voted absentee, but he was allowed to vote in person after he submitted an affidavit disclaiming the absentee ballot. SEEC investigator Scott Branfuhr investigated the complaint

[2] On one of the absentee ballot applications, a staff member wrote "JL" instead of "JM."

and learned that Isen Hoti, another Stamford resident, also had voted by absentee ballot in the election but denied that he had done so. Branfuhr determined that the signatures on the Hotis' absentee ballot applications did not match their genuine signatures on their voter registration cards. Branfuhr recognized the irregularity involving the defendant's initials written on the applications, and Loglisci provided Branfuhr with the other twenty-nine applications that had been marked in a similar fashion. The signatures on those applications also did not match the genuine signatures of the applicants, and Branfuhr concluded that the defendant had submitted thirty-one fraudulent applications and returned twenty-six fraudulent absentee ballots to the Stamford town clerk's office.

The matter was referred to the state's attorney's office in the judicial district of Stamford-Norwalk for further investigation, and the state submitted twenty-nine absentee ballot applications to the state forensic science laboratory for analysis in July 2017. Greg Kettering, a state forensic science examiner, analyzed the handwritten entries on the applications and issued a report dated November 14, 2017, stating his opinion that the entries on twenty-six of the applications "share common authorship." After speaking with Kettering on December 1, 2017, Gary Mecozzi, a supervisory inspector with the Division of Criminal Justice, contacted the defendant's attorney and requested that the defendant submit print and cursive signature exemplars for Kettering to compare with the entries and signatures on the applications. On March 15, 2018, the defendant provided the requested exemplars, which were submitted to Kettering for comparison.

After comparing the defendant's exemplars to the entries and signatures on the questioned absentee ballot applications, Kettering issued a second report dated December 18, 2018, consisting of his case notes for the twenty-nine applications. In his case notes, Kettering detailed his analysis and conclusion with respect to each application. He concluded that there were "indications"

that the handwritten entries on twenty-six of the applications and the signatures on twenty-two of those applications "share[d] common authorship" with the defendant's exemplars. Following his stated conclusion for each application, however, Kettering clarified that his use of the term "indications" meant that there are some identified similarities, "but the evidence falls far short of that necessary to support a definite conclusion."

On January 30, 2019, the defendant was arrested by warrant dated January 24, 2019, on fourteen counts of false statement in absentee balloting and fourteen counts of forgery in the second degree. The arrest warrant affidavit, authored by Mecozzi and dated January 15, 2019, contained the names of thirty-four individuals on whose behalf the ballots in question were submitted to the Stamford town clerk's office. Mecozzi averred that fourteen of those individuals, identified by name, did not complete absentee ballot applications or vote by absentee ballot in 2015. Mecozzi also averred in the affidavit that, according to Kettering, those fourteen ballots, and the defendant's exemplars, contained indications of "common authorship." Mecozzi's affidavit later quoted Kettering as having concluded that " 'the totality of the case points strongly toward [the defendant] as having authored the ballots in question.' " The affidavit was filed with the court and became part of the court file, available to the public for inspection and copying. See Practice Book § 36-2 (a) and (d); see also Practice Book § 44-11.

Prior to trial, the state timely disclosed its intent to call Kettering as an expert witness on handwriting analysis and provided to defense counsel Kettering's written reports regarding the charged offenses. The defense, however, did not attempt to speak with Kettering about his reports or his opinions. On February 9, 2022, the state filed a motion seeking disclosure of the defendant's intention to offer expert testimony, but the defendant did not disclose an expert in response.

The case was tried to the court over the course of seven days, beginning on July 26, 2022, and concluding on

September 1, 2022. The prosecutor called Kettering as the state's final witness on the third day of trial. When the prosecutor moved to qualify Kettering as an expert witness in handwriting and signature analysis, defense counsel objected on the ground that "the trier of fact may himself determine handwriting." The court overruled defense counsel's objection, and the prosecutor began his direct examination of Kettering. Kettering's 2018 report was admitted into evidence, and he testified in detail regarding his case notes for each of the fourteen absentee ballot applications identified in the state's amended information. Due to scheduling issues, including the court's scheduled vacation, there followed a one month delay until the trial resumed.

When the trial resumed, Kettering's direct examination continued, and he testified as to his ultimate conclusion based on his analysis. Kettering explained the various levels of certainty that handwriting experts ascribe to their findings and that those levels are determined based on the number of similarities between the questioned documents and the exemplars.[3] Consistent with his case notes, Kettering testified that, after comparing the handwriting on each of the absentee ballot applications at issue to the exemplars provided by the defendant, there were indications of "common authorship," which is "far short of an identification." When the prosecutor asked Kettering for his opinion based on his analysis of all of the absentee ballot applications, however, Kettering stated that "[t]he totality of [his] opinion" was that it was "virtually certain" that the questioned documents and the defendant's exemplars "shared a common author." Kettering explained that,

---

[3]Kettering testified regarding the terminology used for expressing his opinions, as set forth in the Scientific Working Group for Forensic Document Examination "Standard Terminology for Expressing Conclusions of Forensic Document Examiners," which reflect varying degrees of certainty as to whether the questioned and known writings share common authorship: (1) "identification (definite conclusion of identity)"; (2) "strong probability (highly probable, very probable)"; (3) "probable"; (4) "indications (evidence to suggest)"; (5) "no conclusion (totally inconclusive, indeterminable)"; (6) "indications did not"; (7)

although the six or seven similarities he found on each application were insufficient to support a definite identification, the 178 total similarities led him to conclude that it was "[h]ighly probable" and "virtually certain" that the signature exemplars and the questioned documents shared a common author.

During cross-examination, Kettering acknowledged that his conclusion based on an examination of all of the ballots and exemplars was not included in his case notes, and defense counsel orally moved to strike Kettering's testimony with respect to "any conclusion that's not found in [Kettering's] reports." Defense counsel argued that "[t]he reports were disclosed to us, we're entitled to rely on them," and that "this is the first time anybody is hearing anything about these types of conclusions." In response, the prosecutor observed that the state had disclosed Kettering as a witness months earlier and argued that, "[i]f there were questions that [defense counsel] wanted to ask [of Kettering], he was free to do so." The court denied the defendant's motion to strike, and defense counsel continued with the cross-examination of Kettering.

After the luncheon recess on the fifth day of trial, defense counsel indicated that he would like to call his own expert witness to respond to Kettering's opinion that, based on the total number of similarities he found, it was "virtually certain" that the absentee ballot applications and the defendant's exemplars shared a common author. Defense counsel argued: "I have not seen this conclusion, this methodology, anywhere in any of the documents we've been provided . . . and it's the polar opposite conclusion of the ones that [Kettering] has come to and [that] we've had in our hands for a long time. I think the record is clear that the first time anybody's ever heard about that was yesterday. So, in anticipation of counsel being late on this, I'd like the record to reflect that everything in front of me, and all the reports, point to a different conclusion that this court may consider."

"probably did not"; (8) "strong probability did not"; and (9) "elimination . . . ." (Emphasis omitted.)

In response, the prosecutor argued that there was no unfair surprise because Kettering had been disclosed years earlier, along with his written reports, which had been available to the defense throughout the lengthy history of the case. After noting that Kettering's analysis spanned more than one year, requiring roughly forty hours of work per absentee ballot application, the prosecutor contended that allowing the defense to introduce a new expert at such a late stage would be logistically problematic and fundamentally unfair. The prosecutor emphasized that any failure to investigate Kettering's credentials or to retain a defense expert was attributable to a lack of due diligence, and urged the court to deny the defense's request. The court denied defense counsel's request, reasoning that, because the state had disclosed its expert far in advance of trial, the defense should have secured its own expert earlier, and allowing a new expert so late in the trial would be impractical and unfair.

Following the trial, the court issued a memorandum of decision, finding the defendant guilty on all of the charges. The court credited Kettering's testimony and found that, "taken together, it was virtually certain and highly probable that the exemplars, entries and signatures shared a common author." **(Emphasis omitted.)** The court sentenced the defendant to thirteen months of incarceration, execution suspended, followed by two years of probation, and ordered the defendant to pay fines totaling $35,000.

The defendant appealed to the Appellate Court from the judgment of conviction, claiming, among other things,[4]

---

[4]The defendant also claimed that (1) the evidence was insufficient to support his conviction, (2) the trial court erred in allowing the state to amend the information in the middle of trial, (3) the absence of a rule requiring the state to disclose the sum and substance of its expert's testimony violated his due process rights, (4) the court improperly denied his motion to strike the testimony of a witness who testified for the state but then invoked her constitutional privilege against self-incrimination when called by the defense, and (5) the court erred in denying his motion to dismiss on the ground of selective prosecution. See *State* v. *Mallozzi*, supra, 225 Conn. App. 790.

that the trial court had abused its discretion in denying his request to disclose a handwriting expert because Kettering's "'conclusions at trial were completely different from those in the disclosed report[s].'" *State* v. *Mallozzi*, supra, 225 Conn. App. 806. The defendant argued that "he was 'sandbagged' by Kettering's testimony"; id., 812; and that he was ready to disclose his expert and have the expert testify remotely in a timely manner. Id., 812–13. He represented that his expert would have testified about the validity of Kettering's process of "aggregating" similarities to arrive at a more definitive conclusion as to common authorship. (Internal quotation marks omitted.) Id., 813.

The Appellate Court rejected the defendant's argument that he was "'sandbagged,'" reasoning that "Kettering's [totality of the case] conclusion had been disclosed in the arrest warrant affidavit . . . more than three years prior to trial," and the defense neither sought to discuss Kettering's opinions with him nor retained its own expert to rebut them. Id., 812. The Appellate Court also noted that, instead of identifying the undisclosed expert and making a proffer as to the expected testimony, defense counsel only "vaguely suggested that his expert would perhaps provide one hour of testimony." Id., 813. Accordingly, the Appellate Court concluded that the trial court had not "abused its discretion in denying defense counsel's request to present undisclosed expert testimony on the fifth day of trial, especially in the absence of any meaningful proffer as to the substance of [the expert's] opinion." Id.

We granted the defendant's petition for certification to appeal, limited to whether the Appellate Court correctly concluded that the trial court had not abused its discretion in denying defense counsel's request to disclose an expert to rebut the testimony of the state's handwriting expert. See footnote 1 of this opinion.

We begin by noting what is not at issue in this certified appeal. The defendant does not claim, and did not claim

in the Appellate Court, that the state violated any of its disclosure obligations under the Practice Book's criminal discovery rules. In fact, in his principal appellate brief to this court, the defendant stated: "[A]s interpreted to date, [Connecticut's] criminal discovery rules do not require the state to disclose an expert's actual opinion, the basis thereof, or even [to] disclose a witness as an expert at all."[5]

---

[5]Approximately one month after the defendant filed his principal appellate brief, this court decided *State* v. *Dabate*, 351 Conn. 428, 331 A.3d 1159 (2025). In *Dabate*, we concluded that the prosecutor had committed impropriety by failing to disclose the oral opinion of an emergency medicine physician who treated the defendant on the day of the murder and believed that the defendant's puncture wounds appeared to be self-inflicted. Id., 458–59, 461–62. The physician orally communicated that opinion to the state months before trial. Id., 459. Although the state was aware that the oral statement materially undermined the defendant's theory of the case, it neither requested that the physician memorialize the statement in writing nor disclosed it to the defense. Id., 459, 461. The state nevertheless maintained that it had no disclosure obligation because the physician's oral statement had never been reduced to writing. Id., 461. We rejected that contention. Id., 462. Although Practice Book § 40-11 (a) (3) does not expressly require the disclosure of an expert's oral statement; id., 461 n.21; we concluded that, under the circumstances presented, the state's failure to disclose the physician's statement violated that provision. Id., 461–62. We further cautioned that "the state risks violating [a] defendant's due process rights by choosing not to write down material information in order to circumvent its discovery obligations." Id., 461 n.21. Accordingly, we concluded that the prosecutor not only "failed to comply with his obligations under Practice Book § 40-11 (a)"; id., 460; but also engaged in prosecutorial impropriety. Id., 462. In so doing, we emphasized that "tactics such as the one engaged in by the prosecutor in [*Dabate*] are inconsistent with a prosecutor's obligation to seek justice consistent with the law and the evidence." Id., 459–60. We further observed that "the central purpose of a criminal trial is 'to ascertain the truth which is the sine qua non of a fair trial.'" Id., 460, quoting *Estes* v. *Texas*, 381 U.S. 532, 540, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965).

Neither the state in its appellate brief nor the defendant in his reply brief cites to or discusses the applicability, if any, of *Dabate* to the present case. The state in its appellate brief did, however, discuss our decision in *State* v. *Genotti*, 220 Conn. 796, 601 A.2d 1013 (1992), in which we held that the rules for disclosure of expert reports, which have since been amended, apply only to "information recorded in some tangible form"; (internal quotation marks omitted) id., 808; and that the parties are not required "to have [an] expert witness *prepare* a written

report when one is unnecessary." (Emphasis in original.) Id., 809. The defendant's reply brief did not address *Genotti*. Given the limited issue before us and the manner in which that issue has been briefed by the parties, we do not consider whether the state's disclosure of Kettering's opinion was in compliance with the state's discovery obligations under the Practice Book or to what extent, if any, our holding in *Genotti* was modified by *Dabate*, which makes no mention of *Genotti*. We note, though, that the defendant has made no claim that the prosecutor's conduct in this case constituted impropriety.

In light of what could be perceived as a tension between our holdings in *Genotti* and *Dabate*, we encourage the Rules Committee of the Superior Court to consider revisions to the rules of criminal discovery to ensure that the tactics we condemned in *Dabate* are expressly prohibited. We further note that our rules of practice governing expert disclosure in criminal cases are significantly less structured and demanding than are the rules for expert disclosure in civil cases. See generally Practice Book § 13-4. Requiring more robust expert disclosure in criminal cases, as the Division of Criminal Justice's Policies and Procedures currently endeavor to provide; see Office of the Chief State's Attorney, Connecticut Division of Criminal Justice Policies and Procedures (April 9, 2025) Policy 512 (Discovery) pp. 2–3, available at http://portal. ct.gov/gaming/-/media/dcj-beta/policies/2025dcj-discoveryfinal4925. pdf  (last visited July 7, 2026); may better allow "both parties the maximum possible amount of information with which to prepare their cases and thereby [reduce] the possibility of surprise at trial." (Internal quotation marks omitted.) *State* v. *Tutson*, 278 Conn. 715, 744, 899 A.2d 598 (2006).

Notably, rule 16 of the Federal Rules of Criminal Procedure requires that the parties identify an expert and disclose the substance of the expert's expected testimony; see Fed. R. Crim. P. 16 (a) (1) (G) and (b) (1) (C); which is in accord with the rule governing expert disclosure in civil cases in Practice Book § 13-4 (b) (1). Many states also have adopted expert disclosure rules with similar requirements. See, e.g., Ga. Code Ann. § 17-16-4 (a) (4) (2013) (prosecution must disclose "a summary of" expert's opinion and "reduce . . . to writing" and disclose any oral portions of expert's report); Kan. Stat. Ann. § 22-3212 (b) (2) (2023) (prosecution must provide "a summary or written report" of expert's expected testimony); Nev. Rev. Stat. § 174.234 (2) (a) (2025) (prosecution must provide summary of "the substance" of expert's expected testimony); N.Y. Crim. Proc. Law § 245.20 (1) (f) (McKinney Cum. Supp. 2026) ("if no report is prepared" by expert witness, prosecution must provide "a written statement of the facts and opinions" that expert is expected to provide during testimony); see also, e.g., Alaska R. Crim. P. 16 (b) (1) (B) (prosecution must disclose "the substance" of expert's expected testimony); Del. R. Crim. P. 16 (a) (1) (E) (prosecution must disclose "a written description of the substance" of expert's expected testimony); Idaho R. Crim. P. 16 (b) (7) (prosecution must disclose "a

The sole issue before us is whether the trial court abused its discretion in not granting the defense a continuance to present the testimony of a previously undisclosed expert witness.[6] Practice Book § 40-13 (c) provides in relevant part: "No witness shall be precluded from testifying for any party because his or her name

written summary or report" of expert's expected testimony); Ky. R. Crim. P. 7.24 (1) (prosecution must provide "a written summary" of expert's expected testimony); Md. R. 4-263 (d) (8) (A) and (C) (prosecution must disclose "the substance of expert's findings and opinions," including "any oral report and conclusion by the expert"); Mich. R. Crim. P. 6.201 (A) (3) (prosecution must provide either "a report by the expert or a written description of the substance" of expert's expected testimony); N.D. R. Crim. P. 16 (a) (1) (F) (prosecution must provide "a written summary" of expert's expected testimony); R.I. R. Crim. P. 16 (a) (6) (prosecution must provide "[a] written summary" of expert's expected testimony); Va. Sup. Ct. R. 3A:11 (b) (4) (A) (prosecution must disclose expert's report or, "if there is no such report, a written summary" of expert's expected testimony).

On the other hand, in Connecticut, it appears that criminal defendants already have largely unfettered access to the state's disclosed expert witnesses. The Division of Criminal Justice's policies provide that prosecutors must not interfere with a witness' ability to speak with defense counsel or discourage a witness from doing so. See Division of Criminal Justice, Connecticut Prosecution Standards (2d Ed. April 2026) standard 2-10.8, p. 86, available at https://portal.ct.gov/dcj/-/media/dcj-beta/conn-pros-standards-2nd-edition-final-42926.pdf (last visited July 7, 2026). Indeed, in the present case, the defendant does not dispute that he could have talked to Kettering at any time prior to trial.

Because our rules for expert disclosure in criminal cases have not materially changed in more than thirty years, and considering the general "trend has been in the direction of consistently broadening the reach of defense discovery"; 5 W. LaFave et al., Criminal Procedure (4th Ed. 2015) § 20.1 (c), p. 421; the rules committee should give serious consideration, with the input of the criminal defense bar and the Office of the Chief State's Attorney, to creating a more formalized expert disclosure process.

[6]Practice Book § 40-13 (b) provides in relevant part: "Upon written request by the prosecuting authority . . . the defendant . . . shall promptly, but no later than forty-five days from the filing of the request, unless such time is extended by the judicial authority for good cause shown, disclose to the prosecuting authority the names and . . . the addresses of all witnesses whom the defendant intends to call in the defendant's case-in-chief . . . ."

In the present case, the state made a written request for disclosure of witnesses. The defense did not disclose any witness to rebut Kettering's expected testimony.

. . . was not disclosed pursuant to this rule if the party calling such witness did not in good faith intend to call the witness at the time that he or she provided the material required by this rule. In the interests of justice the judicial authority may in its discretion permit any undisclosed individual to testify." Although "§ 40-13 (c) embraces a presumption against precluding a witness' testimony as a sanction for a delayed disclosure"; *State* v. *Haynes*, 352 Conn. 236, 263–64, 336 A.3d 1139 (2025); "it is incumbent on the defendant to make a showing of good cause" for any late disclosure. *State* v. *Boucino*, 199 Conn. 207, 215, 506 A.2d 125 (1986).

In exercising its discretion, the trial court should consider "whether the disclosure violation was technical or substantial, the timing of the ultimate disclosure, the reason, if any, for the violation, the degree of prejudice to the parties respectively offering and opposing the evidence, whether any resulting prejudice might be cured by a postponement and, if so, the overall desirability of a continuance." (Internal quotation marks omitted.) *State* v. *Tutson*, 278 Conn. 715, 740, 899 A.2d 598 (2006). "As with any discretionary action of the trial court, appellate review requires every reasonable presumption in favor of the action, and the ultimate issue is whether the trial court could reasonably conclude as it did." (Internal quotation marks omitted.) *State* v. *Hargett*, 343 Conn. 604, 631, 275 A.3d 601 (2022). A trial court does not abuse its discretion unless it "has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Internal quotation marks omitted.) Id., 631–32.

On appeal, the defendant claims that the Appellate Court erred in concluding that the trial court had not abused its discretion in denying defense counsel's request to disclose an expert. He argues that he did not intend to call an expert witness "until . . . Kettering decided to inject a novel theory of 'aggregation' into the case . . . ." According to the defendant, the arrest warrant affidavit failed to provide him with any notice of Kettering's

ultimate conclusion because Kettering's "subsequently disclosed reports contradicted [Mecozzi's] statements contained in the [arrest] warrant affidavit." He further argues that he "sought only a brief . . . opportunity to disclose an expert on a limited issue [that] would not have delayed a bench trial or caused the state to adjust its trial strategy." We are not persuaded.

Applying the relevant factors, we conclude that the trial court did not abuse its broad discretion under Practice Book § 40-13. Defense counsel's request to present testimony from a previously undisclosed (and still unidentified) expert witness on the fifth day of trial, made during cross-examination of the state's final witness, constituted a substantial departure from the defense's disclosure obligation. See, e.g., *State* v. *Boucino*, supra, 199 Conn. 214 (defendant's disclosure of alibi witness when state was close to concluding its case-in-chief was "substantial" violation of disclosure obligation); see also *State* v. *Tutson*, supra, 278 Conn. 745 (defendant's untimely disclosure of alibi testimony after state had concluded its case-in-chief could not be cured by continuance because "any potential damage to the state's case caused by admission of the proffered testimony would have been, for all intents and purposes, irreversible and unduly prejudicial").

The sole reason given for the late disclosure was defense counsel's assertion that the defense had been surprised by Kettering's testimony that "[t]he totality of [his] opinion" is that it is "virtually certain" and "[h]ighly probable" that the defendant authored the absentee ballot applications.[7] As the Appellate Court noted, however, the arrest warrant affidavit identified Kettering as the

[7]During its oral ruling, the trial court stated: "[W]henever an expert is disclosed on a witness list, typically, that means [that] the state probably is going to rely heavily on expert testimony to prove its case. It doesn't matter what the expert says. The conclusions are available to both counsel. Whatever the expert may say that is not anticipated does not preclude . . . defense counsel from knowing . . . [that] the state is probably going to rely on an expert. We need to get our own." Whatever our discovery rules provide presently, we do not endorse this as an accurate statement of the law.

state's forensic document examiner who had concluded that "the totality of the case points strongly toward [the defendant] as having authored the ballots in question." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Mallozzi*, supra, 225 Conn. App. 812. Although the defendant dismisses the arrest warrant affidavit as representations of Mecozzi rather than Kettering, the use of quotation marks made clear that it was Kettering's opinion—not Mecozzi's—that the "totality of the case" pointed to the defendant as the author of the disputed ballots. Thus, any discrepancy between Kettering's individual conclusions contained in his case notes in the 2018 report and his "totality of the case" conclusion in the 2019 arrest warrant affidavit was readily apparent to the defense before trial. Defense counsel could have questioned Kettering about that discrepancy prior to trial or timely disclosed an expert to rebut Kettering's conclusions, but he did not.

We also are unpersuaded by the defendant's argument that, because Kettering's reports and notes were produced to the defense after the arrest warrant had issued, it was reasonable for the defense to conclude that the state had abandoned the "totality of the case" conclusion. Both of Kettering's reports predated the arrest warrant application. The defense therefore was on notice that the "totality of the case" conclusion was based on Kettering's previously authored reports. Accordingly, the trial court reasonably could have concluded that defense counsel had failed to demonstrate good cause for the late disclosure because it was avoidable. See, e.g., *State* v. *Jackson*, 334 Conn. 793, 813, 224 A.3d 886 (2020) (party's "failure to prepare for trial in a timely fashion is not a valid reason for a late disclosure of an expert witness").

Furthermore, given defense counsel's vague representations about the substance of the expected testimony, any consideration of prejudice or the desirability of a continuance would be speculative. See, e.g., *State* v. *Boucino*, supra, 199 Conn. 215–16 (because "[n]either the defendant nor the state requested an evidentiary

hearing to consider the prejudice that [the defendant's belated disclosure] caused the state, or the prejudice to the defense caused by exclusion [of the defendant's alibi witness]," record lacked "the necessary facts to justify a finding that the sanction of exclusion was unwarranted"); see also *State* v. *Aillon*, 202 Conn. 385, 395–96, 521 A.2d 555 (1987) (defendant "failed to make any evidentiary showing that [the expert's] testimony would have aided the defense" when "[the] request for a continuance was based solely on [defense] counsel's representation that [the expert] was willing to analyze the . . . evidence and 'would be in a position to testify'"), overruled in part on other grounds by *State* v. *Butler*, 262 Conn. 167, 810 A.2d 791 (2002).

Before the trial court, defense counsel stated that he sought "to try to call [his] own expert for the purposes of clarifying the procedural rules . . . that [Kettering was] operating under, and whether . . . [his totality of the case] conclusion [was] viable." Counsel explained that the expected testimony would be "limited testimony, based on no new information. . . . [T]he only thing [the defense's] expert could testify to are comments that [Kettering] has made on the record, that would clarify things, that would help clarify the relationship between the initial conclusions and the jump, for example, indications [of] strong probability." Counsel also stated that "[t]his isn't just simply to come in here and say [that Kettering is] wrong. I'm not even saying that. I'm just saying . . . that, whatever weight his testimony is given, it's given. The point of the matter is, there's points of clarification that only an expert can comment on."

Defense counsel did not identify the undisclosed expert by name or title, or claim that the undisclosed expert had reviewed Kettering's reports or that the expected testimony would undermine Kettering's conclusions. In fact, counsel suggested that his expert *would not* "come in here and say [that Kettering is] wrong." Our precedent establishes that such vague and speculative offers of proof are insufficient to demonstrate an abuse of the trial

court's broad discretion to exclude evidence. See, e.g., *State* v. *Shaw*, 312 Conn. 85, 139, 90 A.3d 936 (2014) ("[b]ecause the defendant's proffer did not inform the trial judge of the specific nature of the evidence . . . or contain specific evidence rather than vague assertions and sheer speculation . . . the court did not abuse its discretion in denying the defendant's request" (citation omitted; internal quotation marks omitted)); *State* v. *Coney*, 266 Conn. 787, 804, 835 A.2d 977 (2003) ("[t]he surmise of defense counsel that 'there might be a possibility that [the defense expert] would come up with a different opinion than . . . [the state's expert]' was simply an inadequate foundation for a proffer of surrebuttal expert testimony"). In the absence of any meaningful information regarding the substance of the expected testimony, we cannot conclude that the trial court abused its discretion in denying defense counsel's request to present testimony from an undisclosed expert witness.[8]

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

_____

[8]This is not to say that denying defense counsel's request was the only reasonable decision for the court. Concerns about potential delay resulting from the late disclosure were minimal because this was a court trial rather than a jury trial. The trial court recognized this point when discussing the monthlong continuance in the middle of the trial, which was due in part to the court's own scheduled vacation. In addition, although the court expressed concerns regarding a potential battle of the experts, the court could have accepted defense counsel's representation that he would need only one hour to present testimony from his undisclosed expert, and the court could have enforced that time limitation. Although, in these circumstances, the trial court reasonably could have granted defense counsel's request, for the reasons stated in this opinion, we cannot conclude that the court "decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Internal quotation marks omitted.) *State* v. *Hargett*, supra, 343 Conn. 631–32.